# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF NEW YORK

WAYLON STEWART,

                                        Plaintiff,

                    -vs-                                    **DECISION AND ORDER**

JO ANNE B. BARNHART,                                        05-CV-6245 CJS
Commissioner of Social Security,

                                        Defendant.

## APPEARANCES

For the Plaintiff:          Louise M. Tarantino, Esq.
                            Empire Justice Center
                            119 Washington Avenue
                            Albany, New York 12210
                            Tel: (518) 462-6831

For the Defendant:          Brian M. McCarthy, A.U.S.A.
                            United States Attorney's Office
                            Western District of New York
                            100 State St. Suite 620
                            Rochester, New York 14614
                            Tel: (585) 263-6760

## INTRODUCTION

**Siragusa, J.** This is an action brought pursuant to 42 U.S.C. § 405(g) to review the

final determination of the Commissioner of Social Security ("Commissioner"), which denied

plaintiff's application for disability insurance benefits and supplemental security income

("SSI") benefits. Now before the Court is defendant's motion for judgment on the pleadings

(# 6) and plaintiff's cross-motion (# 8) for an order reversing the Commissioner's decision

and remanding the case for a calculation of benefits. For the reasons stated below, defendant's motion is denied, plaintiff's motion is granted, and this matter is remanded for calculation of benefits.

## PROCEDURAL BACKGROUND

Plaintiff applied for disability insurance benefits and SSI benefits on March 15, 2004, claiming to be unable to work due to "chronic pancreatitis, agrophobia, panic attacks and a bad back. (R. 52.)[1] The Social Security Administration denied the application on June 10, 2004. An administrative hearing was held on December 15, 2004, before an Administrative Law Judge ("ALJ"). The ALJ issued a Decision on January 12, 2005, finding that plaintiff was not disabled. (R. 12-18.) Plaintiff sought review from the Appeals Council, which denied his request on April 8, 2005. Plaintiff commenced the instant action on May 11, 2005.

## FACTUAL BACKGROUND

At the time of the hearing in this matter, plaintiff was 33 years old, and that he left school after tenth grade. (R. 347.) He testified that, after leaving school, he never received a GED or any educational or vocational training. (R. 347.) Plaintiff was living with his parents, his sister and her two children in his parents' home, and had regular visitation with his own two children (he was divorced). (R. 359.)

According to his earnings statements, plaintiff worked steadily from 1988 to 1994, then from 1996 to 1999. (R. 39, 40-42.) He worked irregularly in 2003 and stopped working in January 2004. (R. 46, 349.) His past employment included jobs in an auto parts store,

---

[1]Unless otherwise indicated, citations are to the Administrative Record filed by the Commissioner with her answer.

a gravel pit, a tobacco pipe factory, as well as doing yard work and working as a substitute janitor and as a laborer. (R. 40-42, 53-54, 75-80, 91, 348-54, 366-67.)

***Medical Evidence***

The following is a summary of the medical evidence that was before the Administrative Law Judge. On April 6, 2003 plaintiff was admitted to Corning Hospital complaining of severe abdominal and back pain of approximately two weeks' duration. (R. 98, 101.) A CT scan of his abdomen and pelvis revealed pancreatic pseudocysts displacing his abdomen. (R. 101.)  He remained in the hospital three days, and he was treated by Mark Mauer, M.D., who diagnosed plaintiff with pancreatitis. (R. 96-97.) In a follow-up appointment on May 6, 2003, Dr. Mauer discussed with plaintiff his  ongoing alcohol abuse and recommended to him that he stop drinking and start attending Alcoholics Anonymous meetings. (R. 197.)

On July 7, 2003, plaintiff was again admitted to Corning Hospital complaining of abdominal pain, nausea, vomiting and back pain. (R. 107, 109.) He described his pain level at that time as 10 out of 10, dropping to three out of 10 after receiving morphine. (R. 109.) A CT scan of his abdomen and pelvis revealed that the pancreatic cyst had nearly doubled in size from the previous scan in April 2003. (R. 113.) After two days in the hospital, plaintiff was discharged and directed to follow-up with Dr. Mauer for treatment of his pancreatitis. (R. 108.)

On July 12, 2003, plaintiff again went to the emergency room at Corning Hospital complaining of abdominal pain, nausea, vomiting and back pain. (R. 116-18.) He described his pain level as 9 out of 10. (R. 117.) In evaluating a CT scan taken during this visit, Andrew McDonnell, M.D., confirmed the previous diagnosis of a large pancreatic cyst and,

in addition, reported that the scan revealed numerous other cysts on plaintiff's pancreas. (R. 122.)

On July 18, 2003, plaintiff had a follow-up appointment with Dr. Mauer. (R. 194-95.) Plaintiff's weight had dropped to 137 pounds from 149.5 pounds in April, and he complained of chronic back pain. (*Id.*) Dr. Mauer arranged a gastroenterology consult and wrote in his clinic note, "patient may need pancreatic enzymes. He will follow-up after gastroenterology consult." (R. 195.) Plaintiff had office visits with Dr. Mauer for other matters on August 1, 8 and 15, 2003. On these occasions, Dr. Mauer noted that plaintiff's weight was 135 pounds, 136 pounds, and 128 pounds, respectively. (R. 190-92.) During the August 1, 2003, visit, Dr. Mauer started plaintiff on Creon 10, a medication used to improve the digestion of persons with a pancreatic condition.[2] (R. 193.)

On September 12, 2003, plaintiff checked into New Horizons Inpatient Program for alcoholism rehabilitation at United Health Services Hospitals in Binghamton, New York. (R. 123-58.) He was discharged on September 30, 2003, with his treatment completed. The discharge summary in the record (R. 126) noted that plaintiff was "in poor physical condition," and that he "appeared to be apprehensive."

On October 30, 2003, plaintiff again saw Dr. Mauer again, who reported that plaintiff was at 164 pounds. Dr. Mauer continued the prescription for Creon 10 and added Protonix for dyspepsia[3] and Paxil for depression. (R. 189.)

---

[2]Creon 10 is a brand name for pancrelipase. U.S. National Library of Medicine and the National Institutes of Health, MedlinePlus®, Drug Information: Pancrelipase (Systemic) (Sep. 16, 2004) available at http://www.nlm.nih.gov/medlineplus/druginfo/uspdi/202436.html.

[3]Indigestion. Merriam Webster's Medical Desk Dictionary 197 (Merriam-Webster, Inc. 1993).

4

On November 19, 2003, Dr. Mauer noted that plaintiff's weight had dropped to 160 pounds. He discontinued the Protonix and started plaintiff on Prevacid. (R. 188.)

On December 22, 2003, plaintiff returned to Dr. Mauer who increased the dosage of Creon because plaintiff was complaining of diarrhea. Dr. Mauer also discontinued Prevacid and started plaintiff on Nexium for treatment of his indigestion. He noted that plaintiff's weight was 166 pounds. (R. 187.)

On January 21, 2004, plaintiff saw Dr. Mauer complaining of continued upset stomach, low back pain, and right foot pain. At that time, plaintiff weighed 158 pounds. Dr. Mauer continued him on Nexium for dyspepsia and scheduled him for an upper endoscopy[4] for further evaluation. (R. 186.) To treat his chronic low back pain, Dr. Mauer prescribed Darvocet-N-100 and prescribed Questran to treat diarrhea. (*Id.*)

On February 5, 2004, plaintiff underwent a colonoscopy and biopsy followed by a esophagogastroduodenoscopy ("EGD") and biopsy. (R. 163-68.) Richard J. Fastiggi, M.D., conducted that examination and wrote in his report that plaintiff had "[p]robable Barrett's esophagus involving distal 3-4 cm of esophagus (biopsies pending) . . . [and] [a]pparent extrinsic compression in the distal greater curvature, antrum and duodenal bulb suspected secondary to persistent pseudocyst." (R. 164.) Dr. Fastiggi advised plaintiff to increase the amount of Creon he took with each meal, to continue the Nexium for the Barrett's

---

[4]In the Operative Record, surgeon Richard J. Fastiggi, M.D., reported that he performed an esophagogastroduodenoscopy. This diagnostic procedure is described as, "A more direct test for diagnosing the cause of heartburn is esophagogastroduodenoscopy (EGD). In this test your doctor inserts a thin, flexible tube equipped with a light and camera (endoscope) down your throat. The endoscope allows your doctor to see if you have an ulcerated or inflamed esophagus or stomach (esophagitis or gastritis, respectively). It can also reveal a peptic ulcer. During an EGD, your doctor can take tissue samples to test for Barrett's esophagus — a condition in which precancerous changes occur in cells in your esophagus — or esophageal cancer, two potential complications of severe heartburn. Analysis of these samples may also reveal the presence of a bacterium that may cause peptic ulcers." Mayo Clinic Staff, *Heartburn/GERD, Screening and Diagnosis* (Oct. 19, 2005), http://www.mayoclinic.com/health/heartburn-gerd/DS00095/DSECTION=6.

esophagus and the Paxil for his depression, that he continue to maintain a good program of staying off alcohol and eat a low-fat diet to decrease the steatorrhea. In addition, he advised plaintiff to obtain a repeat CT scan in the near future, and he recommended to plaintiff that, if it indicated his pancreatic pseudocyst was still present,  he have a surgical consult to consider drainage. (R. 164.)

On February 17, 2004, plaintiff saw Burt Cagir, M.D., a colon and rectal surgery specialist. (R. 231, 284-85.) Plaintiff complained to Dr. Cagir that his upper abdomen was periodically enlarged and  that he had numerous and very loose stools with a high fatty content and mucus. (R. 284.) Dr. Cagir scheduled surgery to drain plaintiff's pancreatic pseudocyst.

On March 11, 2004, Dr. Cagir performed the pancreatic cyst gastrostomy successfully aspirating a dark colored fluid from the cyst. (R. 171.) In an April 2, 2004 follow-up visit with Dr. Cagir, plaintiff complained of upper abdominal discomfort at the surgical site, but stated he was otherwise feeling better. (R. 183.) Plaintiff also stated that he had difficulty sleeping at night, that he could sleep better in a recliner or couch, that his stools were not greasy anymore, that his back pains had improved, and that he was gaining strength. (*Id.*)

On April 20, 2004, plaintiff saw Dr. Mauer complaining of mild nausea and back pain. (R. 182.) Dr. Mauer prescribed Bextra and back exercises.

On May 28, 2004, plaintiff was evaluated on a consultive basis by psychologist Mary Ann Moore. (R. 199-204.) Dr. Moore noted that plaintiff at that time was 32 years old, divorced, and that he was brought to the evaluation by his sister, who also accompanied him into the evaluation session. Plaintiff related to Dr. Moore that he had difficulty during

6

his school years experiencing panic attacks and social anxiety. He also reported experiencing panic attacks when he was an assistant manager for Advantage Auto Store in 1994. He detailed to Dr. Moore: that he had difficulty sleeping and woke frequently; that he had lost 98 pounds in the past two in half years due to medical issues; that he vomited on a daily basis; that he felt depressed, hopeless and that he was irritable; that he became verbally abusive; that he had thoughts of death every day, that he was always tired, that he experienced social isolation and loss of usual interest; that he worried excessively; that he experienced restlessness with frequent pacing; that he had difficulty concentrating; that he had panic attacks on daily basis; that when he went out in public he experienced palpitations, nausea, sweating and trembliness [sic]; that if he has what he called "big panic attacks," he would blackout after vomiting; that he had obsessive-compulsive features, including checking and rechecking the stove and coffee pot; that he needed to have everything just perfect; that he even checked and rechecked the appliances at other people's houses[5]; that he was able to jump in the car and drive several hundred miles because of his decreased need for sleep; and that he was obsessive about his bills. (R. 200.) Dr. Moore's diagnosis, as expressed in her report, was as follows:

| | |
|---|---|
| Axis I | Panic disorder without agraphobia. |
| | Dysthymic disorder. |
| | Social phobia. |
| | Alcohol dependence in remission. |
| | Rule out bipolar disorder. |
| | Rule out attention deficit hyperactivity disorder. |
| Axis II | Personality disorder, and NOS with obsessive-compulsive and antisocial features. |

---

[5]Dr. Moore noted that plaintiff's sister actually volunteered this piece of information.

Axis III       As per claimant, pancreatitis.
Chronic back problems and pain with arthritis.
Barrett's esophagus.

(R. 203.) Dr. Moore recommended that plaintiff receive more regular psychiatric and psychological treatments along with job training "to provide him with skills he can complete given his medical issues." (R. 203.) She listed his prognosis as fair, given his difficulties in dealing with others.

On May 28, 2004, plaintiff also saw John Cusick, M.D., on a consultive basis, for a complete internist examination. (R. 205-09.) Dr. Cusick examined plaintiff and concluded that he suffered from pancreatitis with pseudocyst formation, back pain and depression. (R. 209.) Dr. Cusick specifically noted that plaintiff's "history of mal-absorption and frequent stools suggest, however, a moderate-to-marked limitation for most activities because of the frequent need to defecate. This of course is not objectively documented on the exam." (R. 209.)

On June 21, 2004, plaintiff was hospitalized again, this time at the Robert Packer Hospital in Sayre, Pennsylvania. (R. 250.) There, he underwent another surgical procedure to drain a recurring pancreatic cyst, and during that surgery, his gallbladder was removed. Unfortunately, the surgeon, Thomas J. VanderMeer, M.D., also injured plaintiff's hepatic artery during the procedure. The artery was repaired, but during recovery, plaintiff experienced acute cardiac and respiratory insufficiency requiring advanced cardiac life-support. He remained in the hospital for eight days. (R. 250-63.)

On July 19, 2004 plaintiff saw Dr. Mauer for a follow-up visit. (R. 291-92.) His weight had dropped to 152 pounds, but he was recovering from the surgery. Dr. Mauer noted that plaintiff was slowly improving and could gradually increase his diet, that he had not been

drinking alcohol for one year, and that he was continued on Protonix for dyspepsia, Paxil for depression, Bextra for arthritis and Creon 10 to help with digestion.

During a September 14, 2004 visit, Dr. Mauer noted that plaintiff had a history of elevated blood sugar requiring investigation. (R. 289.) Dr. Mauer ordered blood tests and, on October 6, 2004, reported that the test results indicated plaintiff suffered adult onset diabetes in the mellitus. (R. 287.) He placed plaintiff on a 1,800-calorie American Diabetes Association diet and ordered him to check his blood sugar four times per day. (R. 287.)

On November 5, 2004, Dr. Mauer examined plaintiff and completed a report entitled "Medical Assessment of Ability to Do Work Related Activities (Physical)." (R. 304-08.) In that assessment report, Dr. Mauer indicated: that plaintiff could occasionally lift or carry up to 20 pounds; that his ability to sit, stand and walk were affected by his lower back pain and thoracic back pain; that he could sit up to three hours in eight-hour workday, but no longer than one hour without interruption; that he could stand up to four hours in eight-hour workday, but no longer than one hour without interruption; and that he could walk up to three hours in eight-hour workday, but no longer than ten minutes without interruption. (R. 304-05.) Dr. Mauer also indicated that plaintiff suffered limitations with regard to postural activities such as climbing, balancing, stooping, crouching, kneeling and crawling, which he could perform only occasionally. (R. 306.) Dr. Mauer further stated in the assessment that plaintiff was limited to reaching and pushing or pulling only occasionally and that he should avoid heights because of his fear of them. (R. 307.) To the question on the report, "[h]ow often is your patient's experience of pain severe enough to interfere with attention and concentration?"  Dr. Mauer  responded by checking "[o]ften." (R. 308.) Dr. Mauer also indicated that plaintiff frequently experienced pain severe enough to interfere with his

9

quality of sleep and that plaintiff was likely to experience "good days" and "bad days." Finally, Dr. Mauer indicated that on average, plaintiff was likely to be absent from work as a result of impairments or treatment more than four days per month. (R. 308.)

In a January 25, 2005 letter to the Administrative Law Judge, Dr. Cagir indicated that plaintiff had been a patient of his for over a year, having been referred to him for a pancreatic pseudocyst and chronic pancreatitis. Dr. Cagir noted that plaintiff "has been suffering from chronic abdominal pain throughout all of the hospital admissions and office visits. The patient has significant loss of exocrine and and endocrine pancreatic insufficiency due to chronic alcoholism. As you know, he is off alcohol for 18 months duration. The patient has every element of chronic pancreatitis." (R. 334.) Dr. Cagir wrote that,

> [i]n 95% of patients with chronic pancreatitis, the principal symptom is abdominal pain.... in more than half of patients with chronic pancreatitis the pain is radiated to [the] patient's back. With patients with ongoing chronic pancreatitis usually pain is not relieved and patients may become addicted to narcotics. As you know, from reviewing Mr. Stewart's records, he has been suffering from this chronic pancreatitis and painful attack associated with chronic pancreatitis. The patient has other elements of chronic pancreatic consistent with exocrine and endocrine pancreatic insufficiency requiring treatment with medication. Not only that, his recent CT scan of abdomen and pelvis has been revealing extensive pancreatic calcifications indicating high possibility of chronic pancreatitis. From the most recent CT scan review by me and our radiologist in Sayre that [sic] the patient has been suffering from a mild acute pancreatic pattern with a chronic pancreatic pattern. The patient also has residual scarring from this [sic] ongoing chronic pancreatitis attacks.
>
> Putting [sic] all of these above findings indicates that the patient is suffering from chronic pancreatitis and all the problems associated with that. Although he is a 33-year-old young male, to the best of my knowledge is totally disabled from his ongoing pancreatitis.

(R. 334-35.)

***Medical Evidence of Mental Impairment***

Medical records from the Corning-Steuben clinic show that on July 22, 1998, plaintiff

was seen by Robert Meneses, M.D., complaining,

> that he feels that sometimes his chest hurts and he feels like his heart is
> racing and palpitating.… Sometimes he gets really anxious. He gets really
> nervous especially around people that he doesn't know. This is something
> really recent and strange for him. He never really had problems similar to this
> in the past. He has some stress but no undue amount. He does have
> problems with sleeping. He didn't sleep much.

(R. 248.) Dr. Meneses' concluded  that plaintiff was suffering from anxiety disorder,

possibly panic disorder, nicotine dependence and alcohol abuse. He provided plaintiff with

education materials concerning anxiety disorder and started him on Zoloft, with a plan to

see him again in approximately a month for re-evaluation. He also advised plaintiff to

reduce or stop smoking and drink only moderately.

In a follow-up visit with Dr. Meneses on August 17, 1998, plaintiff told him that, while

at work, he suddenly felt an episode of panic. (R. 247.) Plaintiff described his symptoms

as follows: that he became very nervous; that he felt sweaty and tingly all over; that he had

a shaking episode; and that he had felt nauseous. At the time of the examination, Dr.

Meneses noted that plaintiff appeared somewhat anxious. Plaintiff complained that

increasing the dosage of Zoloft, per Dr. Meneses' instructions, made him too sleepy. Dr.

Meneses, therefore, switched plaintiff to Paxil. (R. 247.)

On August 24, 1998, plaintiff again saw Dr. Meneses  and reported that he had

been feeling well overall. Dr. Meneses noted that if plaintiff had "breakthrough," he would

have to adjust the medication. (R. 246.)

On October 7, 1998 plaintiff had another follow-up visit with Dr. Meneses. (R. 245.) Plaintiff reported that he was doing better, but was still anxious at times, particularly when he was with people with whom he did not know. He also stated that he had returned to work without a problem, but that he was still apprehensive about going to unfamiliar places. Dr. Meneses noted that plaintiff had not cut back on his alcohol consumption.

Plaintiff saw Dr. Meneses for a follow-up on February 3, 1999. Plaintiff informed Dr. Meneses that he had been very nervous, that he was trying to quit alcohol but still drinking, and that he had been having some problems with shaking. He also related that he had problems at work and that he "gets really shaking and nervous. He is afraid that while operating the sawmill or machinery, he could become unconscious and get hurt. He is very upset and very anxious about this." (R. 244.) Dr. Meneses noted that plaintiff appeared very tremulous and somewhat tearful. He also stated that plaintiff "definitely has panic disorder and probably some withdrawal from the alcohol." (R. 244.) He took plaintiff off work for two weeks, but wrote, "if he fails to show up at the AA meetings, we will not support his leave of absence." (R. 244.)

Progress notes[6] in the record dated November 8, 1999, indicate that plaintiff had been sober for 21 days, that his anxiety and tremors had abated, and that his social phobia persisted, but improved. (R. 299.) Progress notes dated January 24, 2002, indicate that plaintiff was unable to go out in public due to anxiety. (R. 297.) Progress notes from February 22, 2002 state that plaintiff had been able to go out to dinner once at a busy

---

[6]These progress notes are hand-written with illegible signatures and no printed names.

restaurant and had gone shopping twice, and that, although his anxiety persisted, it had improved somewhat. (R. 293.)

Medical records pertaining to plaintiff's physical ailments also note his past medical history for social anxiety and depression and his treatment with Paxil. (R. 98, 99, 109, 169, 173, 174, 187, 188, 189, 192, 194, 196, 251, 253,  261, 284, 289, 291, 292.)

### Plaintiff's Testimony

Plaintiff testified at the administrative hearing held on December 15, 2004. (R. 346-71.) He recounted his work history (R. 348-354, 366-367, 369-370) and related that he was no longer able to work due to his inability "to perform physically on a daily basis. The pain." (R. 354.) Plaintiff told the ALJ that he took a number of medications including Vicodin for his abdominal and back pain (R. 354-355), Pangestyme, a pancreatic replacement enzyme to aid digestion (R. 355-356), Proxatine, the generic name for Paxil, for anxiety and depression (R. 356), Bextra for the arthritis inflammation in his back (R. 356), Protonix for his esophageal disorder (R. 356), aspirin to keep a transplanted artery in his liver from clotting (R. 356) and Bendomin for his diabetes (R. 356). Plaintiff testified that he was 6 feet 1 inch tall and weighed 153 pounds, and that he had recently lost 13 pounds as a result of dietary changes required because of his diabetes. (R.357-58.) Plaintiff also confirmed that he had been alcohol-free for the past 15 months. (R. 358.)

Plaintiff further testified that he saw Dr. Cagir regularly because his medications affected his digestive problems and his bowels: "the side effects from all my different medications kind of fight with each other, and it really screws me up. I lose my concentration, it messes with my bowels, it pretty much—they just argue with each other, my medications with my guts." (R. 365.) He also stated that he saw Dr. Cagir if he

13

experienced orange-colored diarrhea, a sign of another cyst or other problem. (R. 367-68). He further indicated that he used the bathroom between four and 12 times daily, and that he always needed to know the location of the nearest bathroom, because "I have to go when it comes on, and it comes on all at once. My stomach will roll, and then it'll like growl like, and the pain hits, and I've got to go, or I won't make it." (R. 371.)

With respect to his mental impairments, plaintiff testified that he did not like being around people and that he panics around adults. (R. 368.) He recounted that, at a job where he worked with the public, he began having problems answering the phone: "I'd choke up, lose my voice, start shaking, sweating—." (R. 369.) He further testified that he continued to have panic attacks about one a month even after he stopped. He stated, "I avoid them [panic attacks], because I just don't go to places that I know I'm going to be put in a position where I'm surrounded." (R. 370.) He described that his panic attacks caused him to shake, tremble, experience hot flashes, sweaty hands, lose his voice and vomit. (R. 370.)

### Medical Expert

The ALJ employed the services of a medical expert, licensed psychologist David Weinberger from Kingston, Pennsylvania. (R. 234, 235-236.) Dr. Weinberger reviewed medical records from plaintiff's Social Security file, but did not perform an examination of him. (R. 234.) On October 7, 2004, Dr. Weinberger submitted a "Medical Source Statement of Ability to Do Work-Related Activities (Mental)" form. (R. 237-39.) Dr. Weinberger noted in that form that plaintiff's ability to understand, remember and carry out instructions was slightly to moderately affected by his mental impairments; that his ability to respond to supervision, coworkers, and work pressures in a work setting were

also moderately affected by his mental impairments; and that plaintiff's mood, attention, concentration, persistence and pace were adversely affected by his physical problems, including pain and chronic pancreatic insufficiency. (R. 237-38). Although Dr. Weinberger noted that, based solely on his mental impairment, plaintiff retained the capacity for work-related activity, he concluded that the additional restrictions imposed by his physical limitations impacted his employment potential. (R. 239.) In that regard, he noted that most of plaintiff's functional limitations were due to his physical condition, including pain and chronic pancreatitis. Dr. Weinberger wrote  that plaintiff's allegations of pain associated with a back problem and pancreatitis, in addition to an anxiety related disorder, were supported by the medical evidence. (R. 242). In a separate document entitled "Medical Opinion of David M. Weinberger," and dated October 7, 2004, Dr. Weinberger wrote that none of plaintiff's mental impairments met any Social Security Listing. (R. 240.)

### *Vocational Expert's Testimony*

The ALJ also employed the services of a vocational expert ("VE"), George Starosta, who gave testimony at the hearing. (R. 371-77.) The VE was present in the hearing room during plaintiff's testimony and, in addition, reviewed the Social Security file. (R. 371-72.) The ALJ posed the following hypothetical question to the VE:

> Now, if I were to find that the claimant is limited to simple, repetitive work of one to three steps; not requiring the worker to deal with the general public, or work closely with supervisors or coworkers; with only occasional lifting or carrying of up to—of 20 pounds or less; and only occasional climbing, balancing, stooping, crouching, kneeling, crawling, reaching, pushing or pulling; but no restrictions on handling, fingering, hearing, or speaking, or seeing; with—no working at unprotected heights; and provided further that the worker can sit or stand at his won option; and is able to eat two snacks in addition to the regular lunch or supper break; could he return to any of his past work?"

15

(R. 372-73.) The VE replied that the plaintiff, as described in the hypothetical question, would not be able to return to his past work, but that was other work that he could perform. (R. 373.) The VE suggested the following work: stuffing, in the print-related industry, weight tester, and bench-type packaging. (R. 373.) The ALJ then asked the VE: "Now, if I were to accept [plaintiff's] testimony today as being credible and consistent with the documentary evidence of record, could he perform those representative type jobs?" (R. 374.) The VE responded,

> I would say no, because he would not be able to endure the two—the six- to eight-hour workday on a five-day-a-week basis. And you're only allowed one and a quarter sick days per month, and three days with a doctor's excuse. I don't think he would be able to maintain the endurance that's required for competitive work.

(R. 374.)

### The ALJ's Decision

The ALJ determined that plaintiff met the disability insured status requirements of the Social Security Act as of the alleged onset date of disability and continued to meet those requirements through the date of his decision, January 12, 2005.  The ALJ further found: that plaintiff had not engaged in substantial gainful activity subsequent to the alleged date of disability; that plaintiff's impairments placed significant restrictions on his ability to perform basic work-related activities; that plaintiff did not have an impairment, or combination of impairments, severe enough to meet or equal the criteria for establishing disability under any applicable list of impairments set forth an Appendix 1, Subpart P., Social Security Administration Regulation No. 4; that plaintiff was a 33-year-old younger individual with a limited a tenth grade education, whose past relevant work provided him

16

with no transferable skills appropriate to his functional capacity; that a significant number of acceptable jobs existed in the regional, state and national economies for him; and that, therefore, he was not disabled. (R. 17.) The ALJ also determined that plaintiff, "overstates his symptoms and … that the nonexertional limitations would not offset his ability to meet the demands of a wide range of light work.… Simply stated, the claimant's complaints are inconsistent with the clinical and diagnostic findings found of record, particularly as they relate to his exertional capacity." (R. 16.)

With regard to the VE's testimony, the ALJ accepted the response to his first hypothetical question in which the VE indicated that there existed 3,500 jobs in the regional economy, and greater numbers in the state and national economies, for plaintiff, including the jobs of a print shop worker/stuffer (1,000), bench packager (1,500), and tester (1,000). (R. 16-17.)

### STANDARDS OF LAW

Title 42 U.S.C. § 405(g) states, in relevant part, that "[t]he findings of the Commissioner of Social security as to any fact, if supported by substantial evidence, shall be conclusive." The issue to be determined by this Court is whether the Commissioner's conclusions "are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard." *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998). Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.*

For purposes of the Social Security Act, disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Schaal*, 134 F.3d at 501.

> The SSA has promulgated administrative regulations for determining when a claimant meets this definition. First, the SSA considers whether the claimant is currently engaged in substantial gainful employment. If not, then the SSA considers whether the claimant has a "severe impairment" that significantly limits the "ability to do basic work activities. If the claimant does suffer such an impairment, then the SSA determines whether this impairment is one of those listed in Appendix 1 of the regulations. If the claimant's impairment is one of those listed, the SSA will presume the claimant to be disabled. If the impairment is not so listed, then the SSA must determine whether the claimant possesses the "residual functional capacity" ["RFC"] to perform his or her past relevant work. Finally, if the claimant is unable to perform his or her past relevant work, then the burden shifts to the SSA to prove that the claimant is capable of performing "any other work."

*Schaal*, 134 F.3d at 501 (Citations omitted). At step five of this five-step sequential analysis, defendant may carry her burden by resorting to the Medical Vocational Guidelines or "grids" found at 20 C.F.R. Pt. 404, Subpart P, Appendix 2. *Pratts v. Chater*, 94 F.3d 34, 38-39 (2d Cir. 1996)(citation omitted); *see also*, SSR 83-10 (Noting that in the grids, "the only impairment-caused limitations considered in each rule are exertional limitations.") However, if a claimant has nonexertional impairments which "significantly limit the range of work permitted by his exertional limitations," then defendant cannot rely upon the grids, and instead "must introduce the testimony of a vocational expert (or other similar evidence)

that jobs exist in the economy which claimant can obtain or perform."[7] *Pratts v. Chater*, 94

F.3d at 39; *see also*, 20 C.F.R. § 416.969a(d).[8]

Under the regulations, a treating physician's opinion is entitled to controlling weight,

provided that it is well-supported in the record:

> If we find that a treating source's opinion on the issue(s) of the nature and
> severity of your impairment(s) is well-supported by medically acceptable
> clinical and laboratory diagnostic techniques and is not inconsistent with the
> other substantial evidence in your case record, we will give it controlling
> weight.

20 C.F.R. § 416.927(d)(2); 20 C.F.R. § 404.1527(d)(2). However, "[w]hen other substantial

evidence in the record conflicts with the treating physician's opinion … that opinion will not

be deemed controlling. And the less consistent that opinion is with the record as a whole,

the less weight it will be given." *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999)(*citing* 20

C.F.R. § 404.1527(d)(4)).

## ANALYSIS

Defendant moves for judgment on the pleadings, claiming that the Commissioner's

decision is supported by substantial evidence. However, plaintiff cross-moves to reverse

the Commissioner's decision and remand the case for calculation of benefits. Plaintiff

supports his motion with three arguments: first, that the ALJ failed to give appropriate

---

[7]"Exertional limitations" are those which affect an applicant's ability to meet the strength demands of jobs, such as sitting, standing, walking, lifting, carrying, pushing, and pulling. "Non-exertional limitations" are those which affect an applicant's ability to meet job demands other than strength demands, such as anxiety, depression, inability to concentrate, inability to understand, inability to remember, inability to tolerate dust or fumes, as well as manipulative or postural limitations, such as the inability to reach, handle, stoop, climb, crawl, or crouch. 20 C.F.R. 416.969a.

[8]20 C.F.R. § 416.927(d) provides, in relevant part, that, "[w]hen the limitations and restrictions imposed by your impairment(s) and related symptoms, such as pain, affect your ability to meet both the strength [exertional] and demands of jobs other than the strength demands [nonexertional], we consider that you have a combination of exertional and nonexertional limitations or restrictions. . . . [W]e will not directly apply the rules in appendix 2 [the grids] unless there is a rule that directs a conclusion that you are disabled based upon your strength limitations; otherwise the rule provides a framework to guide our decision."

weight to his treating physicians' opinions; second, that the Commissioner erred in finding plaintiff incredible; and third, that substantial evidence already in the record supports a finding that plaintiff cannot perform work available in the national economy.

### Treating Physician Rule

When a treating physician's opinion is entitled to controlling weight, the ALJ must adopt it. SSR 96-2p; 20 C.F.R. § 416.927(d)(2); 20 C.F.R. § 404.1527(d)(2). Here, both Dr. Mauer and Dr. Cagir provided opinions that were not addressed by the ALJ in his decision. For example, Dr. Mauer, in addition to stating that plaintiff was limited to a restricted range of light-duty work, also stated that plaintiff's attention and concentration would often be impaired by his pain as would his sleep. Moreover, Dr. Mauer stated that plaintiff would likely be absent from work for more than four days per month as a result of his illnesses. (R. 308.) The VE quite clearly stated that, "you're only allowed one and a quarter sick days per month, and three days with a doctor's excuse. I don't think he would be able to maintain the endurance that's required for competitive work." (R. 374.) The ALJ failed to address this important factor in his decision. Further, Dr. Cagir's letter dated January 25, 2005, to the ALJ showed that plaintiff suffered from chronic pancreatitis and that 95% of those who have chronic pancreatitis suffer chronic abdominal pain which often radiates to the back. (R. 334.) Plaintiff's  testimony was consistent with Dr. Cagir's finding. He stated to the ALJ that he experienced pain on "the right side of my belly button straight through to my whole right lower back, left ankle, center of my top [sic] of my stomach," and that the pain was "[c]onstant." (R. 354.) Plaintiff's claims with regard to pain have been consistent throughout his medical history and no medical professional has suggested that plaintiff was exaggerating the pain he felt. Further, the consultative examiners' reports  do not contradict

plaintiff's contentions, or the opinions of his treating physicians, with regard to his pancreatitis. In that regard, consultive examiner, John Cusick, M.D., determined after a thorough physical examination, that plaintiff's "history of mal-absorption and frequent stools suggest, however, a moderate-to-marked limitation for most activities because of the frequent need to defecate." (R. 209.) The ALJ's decision makes no mention of this determination.

Turning to the issue of limitations resulting from plaintiff's panic attacks, consultive psychologist Mary Ann Moore determined that plaintiff suffered from panic disorder without agraphobia and that he would have difficulty functioning in the work place and in maintaining a regular schedule. (R. 203.) Although the non-examining consultive psychologist, David Weinberger, utilized by the ALJ, noted that plaintiff retained the capacity for work-related activity based solely on his mental impairments, he also noted that the restrictions imposed by his physical limitations impacted his employment potential. (R. 239.)

The Commissioner's memorandum of law does not address the treating physician rule, overlooks the same issues overlooked by the ALJ, and fails to convince the Court that her decision is supported by substantial evidence. Had the ALJ given the treating physicians' opinions the weight due to them in this case, he would have necessarily concluded that plaintiff was unable to perform the significant number of acceptable jobs identified by the VE. Therefore, the Court finds that the ALJ's determination to deny plaintiff's benefits is inconsistent with the proper application of the treating physician rule.

**Plaintiff's Credibility**

As the Court indicated above, plaintiff's complaints were supported by the objective medical evidence in the record. Accordingly, the ALJ should have found that his complaints of pain and fatigue were entitled to weight. *See Dwyer v. Apfel*, 23 F. Supp. 2d 223, 230 (N.D.N.Y. 1998). Although the ALJ is free to accept or reject any witness's testimony, a "finding that the witness is not credible must nevertheless be set forth with sufficient specificity to permit intelligible plenary review of the record." *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 260-61 (2d Cir.1988) (citation omitted). Additionally, the ALJ's findings in this respect must be consistent with the other evidence in the case. *See id.* at 261. Here, the ALJ concluded that plaintiff "overstates his symptoms and … that the nonexertional limitations would not offset his ability to meet the demands of a wide range of light work…. Simply stated, the claimant's complaints are inconsistent with the clinical and diagnostic findings found of record, particularly as they relate to his exertional capacity." (R. 16.) The ALJ's decision, however, does not explain in any fashion what inconsistences he found between plaintiff's complaints and the clinical and diagnostic findings. The ALJ's conclusory finding also fails to comply with the Commissioner's own rule as contained in SSR 96-7p:

> In recognition of the fact that an individual's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone, 20 C.F.R. § 404.1529(c) and 416.929(c) describe the kinds of evidence, including the factors below, that the adjudicator must consider in addition to the objective medical evidence when assessing the credibility of an individual's statements:
>
> 1. The individual's daily activities;
>
> 2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;

3. Factors that precipitate and aggravate the symptoms;

4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p (Jul. 2, 1996). Although that Ruling also states, "[o]n the other hand, the individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints, or if the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure," nothing in the record indicates that plaintiff has failed to seek treatment, or that the level or frequency of treatment is inconsistent with the complaint. Accordingly, the Court determines that the ALJ's decision that plaintiff was not credible is unsupported by substantial evidence in the record.

***Substantial Evidence Already in the Record Supports a Finding That Plaintiff Cannot Perform Work Available in the National Economy***

Since this case passed through the first four steps in the Commissioner's sequential analysis, the burden shifted to the Commissioner on the fifth step. The Court finds that the Commissioner failed to meet her burden of showing that there was other work plaintiff could perform. Most significantly, the ALJ completely ignored the VE's testimony that, accepting plaintiff's testimony as true, he could not perform the jobs the VE testified about. (R. 374.) Moreover, even if the ALJ was justified in finding plaintiff incredible, the VE

testified that if plaintiff were to be out sick four or more times per month, he would not be able to work in any of the jobs the VE listed. (R. 377.) As already noted, Dr. Mauer indicated that plaintiff's condition would probably result in his being absent four or more days per month. (R. 308.) In light of the VE's testimony and the evidence in the record, substantial evidence supports the conclusion that no jobs exist that plaintiff could do. In *Martin v. Bowen*, 652 F. Supp. 1270 (D. Kan. 1987), the district court reasoned:

> Normally, when the ALJ has failed to give full consideration to these other factors, remand to the Secretary is required.… In this case, however, remand on this issue is not necessary. Here, the ALJ sought testimony from a vocational expert at plaintiff's hearing. The ALJ expressly asked the expert whether, given plaintiff's age, education, prior work and near-functional illiteracy and, assuming plaintiff's testimony credible, any light or sedentary jobs, even in an unskilled capacity, existed in which plaintiff could function. The vocational expert testified that no such jobs existed.… In other words, based on plaintiff's age, education and work experience, plaintiff's impairments are of such a severity that he is unable to engage in any substantial gainful work that exists in the national economy. Such a finding mandates the conclusion that plaintiff is disabled. *See* 42 U.S.C. § 423(d)(2)(A).

*Martin*, 652 F. Supp. at 1277 (some citations omitted). In the present case, the VE's testimony[9] conclusively shows that plaintiff is unable to engage in any substantial gainful work that exists in the national economy as a result of his functional and non-functional limitations. Consequently, the Commissioner's decision denying benefits must be reversed.

---

[9]Plaintiff also argues that the VE's testimony was flawed in that he used the incorrect identification from the Dictionary of Occupational Titles for one job, testified that plaintiff could perform another job that required frequent reaching, a limitation that was specifically contained in the ALJ's first hypothetical question, and identified yet another job that required pacing and stress that was likely to exceed plaintiff's walking and standing limitations. (*See* Pl.'s Mem. of Law at 23-25.) In light of the Court's determination, however, it need not address these additional arguments.

### *Remand for Calculation of Benefits*

In *Balsamo v. Chater*, 142 F.3d 75 (2d Cir. 1998) the Second Circuit held that,

> [w]here the reversal "is based solely on the [Commissioner's] failure to sustain [her] burden of adducing evidence of the claimant's capability of gainful employment and the [Commissioner's] finding that the claimant can engage in 'sedentary' work is not supported by substantial evidence, no purpose would be served by our remanding the case for rehearing unless the [Commissioner] could offer additional evidence."

*Balsamo*, 142 F.3d at 82 (quoting *Carroll v. Secretary of Health & Human Services*, 705 F.2d 638, 644 (2d Cir. 1983)). Here, there is no indication that a more fully developed record would support the Commissioner's decision. *See, e.g., Rosa v. Callahan*, 168 F.3d 72, 83 (2d Cir. 1999) ("Because 'further findings' would so plainly help to assure the proper disposition of Rosa's claim, we believe that remand is 'particularly appropriate' in this case."). In that case, there is no realistic likelihood that on remand the Commissioner can sustain her burden to show that plaintiff is employable. *See Vargas v. Sullivan*, 898 F.2d 293, 296 (2d Cir. 1990) (where only "an infinitesimal likelihood that employment of any kind would be available" to claimant, Circuit Court remanded to Commissioner for calculation of benefits).

### CONCLUSION

Accordingly, defendant's motion (# 6) for judgment on the pleadings is denied, and plaintiff's cross-motion (# 8) for an order reversing the Commissioner's decision is granted, and the Commissioner's decision is reversed. Further, this matter is remanded to the Commissioner for calculation of benefits.

So Ordered.

Dated:   May 4, 2006
         Rochester, New York

                    ENTER:

                              /s/ Charles J. Siragusa
                              CHARLES J. SIRAGUSA
                              United States District Judge